**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**
**LAKE CHARLES DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | DOCKET NO. 19-cr-249-1 |
| VERSUS | : | JUDGE JAMES D. CAIN, JR. |
| ELTON J RICHARD, III | : | MAGISTRATE JUDGE KAY |

**REPORT AND RECOMMENDATION**

Before the court is a Motion to Suppress filed by defendant Elton J. Richard, III ("Richard"). Doc. 18. Richard seeks to suppress physical evidence obtained by a search of his vehicle and statements made by him following his arrest. An evidentiary hearing was held and the government produced the testimony of two of the officers present at the time of arrest. The government also introduced video footage from the dash camera and body camera of the arresting officer.

After consideration of the evidence adduced and the applicable law and for reasons stated below, we **RECOMMEND** the motion be **DENIED**.

**I.**
**BACKGROUND**

Richard was indicted by a grand jury and charged with possession with intent to distribute cocaine, a violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A). Doc. 1. The indictment alleges that, on or about September 22, 2018, Richard possessed five kilogram or more of a mixture and substance containing a detectable amount of cocaine. *Id.* Richard argues that contraband in his vehicle was found as the result of a search conducted following a traffic stop and in a manner that

violated his rights under the Fourth Amendment. As a result, he argues, the contraband evidence should be suppressed. Doc. 21. He also argues that potentially inculpatory statements made by him following his arrest were elicited by law enforcement in violation of his Fifth amendment rights and the safeguards expressed in *Miranda v. Arizona*, 86 S.Ct. 1602 (1966), necessitating suppression of those statements. *Id.* In response the government maintains that the initial stop was valid, that defendant consented to detention following the initial stop and, even without his consent, officers had reasonable suspicion of illegal activity so that they were justified in continuing the stop. Doc. 29. The government further maintains that the search was supported by probable cause created by a K-9 open air sniff that alerted to the presence of narcotics in the vehicle. *Id.* As to defendant's inculpatory statement made after arrest, the government argues the statement was made voluntarily by defendant and not in response to any inappropriate questioning by the government. *Id.* The government asks that the motion be denied in its entirety.

Corporal Chad Booth ("Booth") testified at the hearing. Booth is partnered with K-9 Sam, with whom he is certified, and has been for five years with recertifications conducted annually. Booth testified that he is employed by the Lake Charles Police Department attached to the Combined Anti-Drug Task Force ("CAT"). He has been employed in law enforcement since 2007 and has been with the task force for five. He is specifically familiar with highway interdictions involving narcotics, an area in which he has had specific training. His area of responsibility in Calcasieu Parish, Louisiana, is a forty-four mile stretch of Interstate 10, a well-known drug trafficking corridor, and his duties are focused on interstate traffic safety and criminal activity. He testified that he has had training and experience in indicators of criminal activity.

Booth testified that local law enforcement had received information from Homeland Security ("HSI") about a vehicle possibly involved in transportation of narcotics using Interstate

10 Eastbound from Texas into Louisiana. Texas detectives were following the vehicle from Houston to the Louisiana/Texas border and CAT was to pick it up from there. Booth testified that at 4:29 a.m. on the day in question he was stationed at mile marker 15 or 20 in Calcasieu Parish, Louisiana, (15 or 20 miles east of the Texas border) when he saw a vehicle matching the description provided by Homeland Security, i.e. a white tow truck with "Richard" on the side travelling without a tow. Booth began to follow the truck and first noticed the truck drift out of its lane, a violation of Louisiana traffic law.[1] He stated also that he was unable to read the license plate number of the truck as the plate was insufficiently illuminated, also a violation of Louisiana traffic law.[2] Booth activated his lights and pulled the truck over. He stated that he was unable to read the number on the truck's plate until he was approximately 15 feet behind the truck and, even from that distance, only with the assistance of his own headlights. Booth testified the initial basis for the stop was violation of the Louisiana traffic laws.

Once stopped Booth began questioning Richard, the driver (and owner) of the truck. Among other things, Booth asked Richard from where he was travelling and Booth responded he was returning from Vinton, Louisiana, where he had made delivery of a Mustang. Richard claimed that he was able to bring the Mustang only as far as Vinton as he was unlicensed to tow in Texas. He claimed another truck would be picking the Mustang up from there. Richard was unable to name the place where he left the vehicle, he was unable to produce any paperwork at all on the supposedly delivered vehicle, he claimed to be unable to identify who called him out to make the delivery, and he claimed to not know who would be paying him for the tow. Officer Booth testified

---

[1] LA. REV. STAT. § 32:79 providing "[w]henever any roadway has been divided into two or more clearly marked lanes for traffic, . . . [a] vehicle shall be driven as nearly as practicable entirely within a single lane and shall not be moved from such lane until the driver has first ascertained that such movement can be made with safety..
[2] LA. REV. STAT. § 32:304 requiring for every motor vehicle that "[e]ither a tail lamp or a separate lamp shall be so constructed and placed as to illuminate with a white light the rear registration plate and render it clearly legible from a distance of fifty feet to the rear."

he found these answers to be suspicious and not what one would expect from one whose business it was to tow vehicles. Booth also testified that defendant was sweating profusely, "more than anybody ever stopped with my seizure." Based on the fact Booth had reasonable belief (based upon information from law enforcement) that Richard had actually just travelled from Texas, and thus was untruthful in his claim to have just made a tow to Vinton, Louisiana, that Richard was unable to provide coherent and logical answers to simple and routine questions of his activities just prior to the stop, plus the fact that Richard had been sweating profusely, Booth concluded at that point he had reasonable suspicion that Richard was engaging in criminal activity.

Booth issued a warning citation to Richard and told him "that's it for the traffic stop. I have some other questions for you." Richard agreed to stay but Booth admitted he would not have been allowed to leave if he had not consented. Booth asked Richard for permission to search his vehicle and gave him (Richard) a consent to search form. Richard did not sign the form. Booth then removed his K-9 Sam from his unit and followed his usual protocol to conduct an open-air sniff. Sam alerted, officers searched the truck, drugs were found, and Richard was placed under arrest.[3] Much of Booth's testimony was supported by video footage put into evidence. Some activity, such as the lane drifting and Sam alerting, was not captured on film.

After Richard was arrested, he was given his *Miranda* rights by Booth and Booth informed all officers present that Richard had been warned and exercised his right to remain silent. From the video footage and apparently while trying to ascertain whether Richard had been cuffed properly we could hear joking about Richard trying to run to which and officer or more said that

---

[3] Soon after the initial stop Booth was joined by two other units. Booth testified he had not called for backup but stated it was common for other officers to be in the area when they were acting on a tip such as that received from HSI. Calcasieu Parish Sheriff's Deputy Stewart Henderson, also a K-9 handler, testified at the hearing that he also observed Richard sweating profusely and suggested Sam be rewarded for his alerting to the presence of narcotics. Deputy Henderson has been with CPSD since 1997 and working narcotics since 2006.

it appeared as though he had already run, referring to Richard's sweating. Richard then stated something to the effect that he had never done anything like that before but that he had "got in a bad bind."

## II.
## LAW & ANALYSIS

### A. Defendant's Claimed Unlawful Search and Seizure

Generally the proponent of a motion to suppress bears the burden of proving by a preponderance of the evidence that the evidence in question was obtained in violation of his or her Fourth Amendment rights. *United States v. Iraheta*, 764 F.3d 455, 460 (5th Cir. 2014). Where, as here, the search is conducted without the benefit of a warrant then the burden shifts to the Government to prove by a preponderance of the evidence that its actions were constitutional. *United States v. Guerrero-Barajas*, 240 F.3d 428, 432 (5th Cir. 2001).

The Fourth Amendment's protection of "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures" includes "vehicle stops and temporary detainment of a vehicle's occupants." U.S. CONST. amend. IV; *United States. v. Andres*, 703 F.3d 828, 832 (5th Cir. 2013). The Fourth Amendment is silent as to the ramification for an unlawful search or seizure but the jurisprudentially created "exclusionary rule prohibits the introduction at trial of all evidence that is derivative of an illegal search, or evidence known as the 'fruit of the poisonous tree.'" *United States v. Singh,* 261 F.3d 530, 535 (5th Cir. 2001), citing *United States v Grosenheider*, 200 F.3d 321, 327 (5th Cir. 2000).

The constitutionality of a traffic stop is analyzed under the two-part framework promulgated by the Supreme Court in *Terry v. Ohio*. *Terry v. Ohio*, 88 S.Ct. 1868 (1968). The *Terry* test requires courts to "determine whether the stop was justified at its inception," and, if so, "whether the officer's subsequent actions were reasonably related in scope to the circumstances

that justified the stop of the vehicle in the first place." *Andres*, 703 F.3d at 832 (quoting *United States v. Macias*, 658 F.3d 509, 517 (5th Cir. 2011)). An analysis of a traffic stop under *Terry* also mandates that "courts . . . allow law enforcement officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." *United States v. Brigham,* 382 F.3d 500, 507 (5th Cir. 2004) (internal quotations omitted). Further, under the "collective knowledge" doctrine, officers can rely on information from other law enforcement agencies or personnel even if the officer does not have personal knowledge of the evidence creating a reasonable suspicion of the activity reported from the other agency. *United States v. Hensley*, 105 S.Ct. 675, 682 (1985).

The initial inquiry under *Terry* is satisfied if the officer has "an objectively reasonable suspicion that some sort of illegal activity, such as a traffic violation, occurred, or is about to occur, before stopping the vehicle." *United States v. Lopez-Moreno*, 420 F.3d 420, 430 (5th Cir. 2005). In addition, "[s]o long as a traffic law infraction that would have objectively justified the stop ha[s] taken place, the fact that the police officer may have made the stop for a reason other than the occurrence of the traffic infraction is irrelevant for purposes of the Fourth Amendment . . . ." *Goodwin v. Johnson*, 132 F.3d 162, 173 (5th Cir. 1997).

The second portion of the *Terry* framework requires the "detention . . . be temporary and last no longer than is necessary to effectuate the purposes of the stop." *Brigham*, 382 F.3d at 507. During the stop, "a police officer may permissibly examine the driver's license and registration and run a computer check on them to investigate whether the driver has any outstanding warrants and if the vehicle is stolen." *Lopez-Moreno*, 420 F.3d at 430. Such inquiry "may be wide-ranging." *Id.* at 431. Officers "may also ask about the purpose and itinerary of a driver's trip during the traffic stop." *Brigham*, 382 F.3d at 508 (citing *U.S. v. Gonzales*, 382 F.3d 755, 758-59

(5th Cir. 2003)). However, "once all relevant computer checks have come back clean, there is no more reasonable suspicion, and, as a general matter, continued questioning thereafter unconstitutionally prolongs the detention." *Lopez-Moreno*, 420 F.3d at 431. The stop may continue if "the Government can show an exception to the Fourth Amendment." *United States v. Peña-Gonzales*, 618 Fed. App'x 195, 198 (5th Cir. 2015) (quoting *Rodriguez v. United States,* 135 S.Ct. 1609, 1614 (2015)) (quotations and alterations omitted). A common exception derived from *Terry* permits extension of the stop if reasonable suspicion of additional criminal activity emerges or existed in the first place. *Id.*

Reasonable suspicion requires an amount of proof "considerably less than proof of wrongdoing by a preponderance of the evidence" and "obviously less than is necessary for probable cause." *Navarette v. California*, 134 S.Ct. 1683, 1687 (2014) (quotations omitted). If additional grounds for suspicion emerge after the initial stop, the stop may extend "as long as is reasonably necessary" to resolve such suspicion. *United States v. Fishel*, 467 F.3d 855, 856 (5th Cir. 2006) (quoting *Brigham*, 382 F.3d at 512). A court's determination of the existence of reasonable suspicion requires an examination of "the totality of the circumstances in the situation at hand, in light of the individual officers' own training and experience." *United States v. Monsivais*, 848 F.3d 353, 357 (5th Cir. 2017) (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (internal quotations omitted). "Collective knowledge," or intelligence received by other agencies, may also be considered when considering "reasonable suspicion." *U.S. v. Brown*, 567 Fed. App'x 272, 277 (5th Cir. 2014).

Restated simply, a traffic stop is not an unconstitutional seizure of the person if the officer has a reasonable suspicion that illegal activity, such as a traffic violation, has occurred. Once the officer has concluded the business related to the initial constitutional stop, he may thereafter

continue to hold the accused if he has reasonable suspicion that other criminal activity is afoot and may continue that hold the suspect until the officer is satisfied that the criminality is or is not occurring. The continued hold is likewise not unconstitutional seizure of the person.

Both prongs of *Terry* have been clearly satisfied in this case. Defendant was stopped as a result of suspected violations of Louisiana traffic laws. Richard does not argue that his license plate was properly illuminated; rather he states whether it was or was not "is a matter of fact." Doc. 21, p. 4. In his post-hearing memorandum Richard addresses the lane change charge and relies upon a 1984 Louisiana case to argue that the evidence submitted at the hearing in this case would be insufficient to find probable cause to stop. Doc. 33, p. 2, quoting *State v. Vaughn*, 448 So. 2d 915, 916 (La. App. 3d Cir. 1984). "As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." *Whren v. United States*, 116 S. Ct. 1769, 1772 (1996). The evidence adduced at this hearing was sufficient to show that the police had probable cause to believe those violations did in fact occur and, therefore, the stop was justified.[4] The initial stop related to the traffic violations was completed once Richard was given his warning by the officer.

We find also that Booth's continuation of the stop was not improper.

The government initially argues that the continuation was proper because Richard consented to stay after he was told "that's it for the traffic stop." Richard does not address this point and the audio from Booth's body camera supports his testimony that this is indeed the case.

---

[4] The dash cam footage introduced into evidence at trial clearly supported the officer's testimony about difficulty with the illumination of the truck's rear license plate. As we note earlier there was no footage of the lane change but we infer nothing nefarious from that deficiency as defendant in argument apparently would like us to do. Other than suggesting rhetorically in his post-trial memorandum that the officer was "trying to find some reason" to stop defendant after receiving the information from HSI [Doc. 33, p. 2], defendant does not argue that he did not, in fact, improperly cross the marked lanes of traffic and no evidence was adduced that would contradict the testimony of the officer or call his credibility into question. Regardless of whether Richard drifted, the lack of illumination of his license plate alone would have provided sufficient grounds for the initial stop.

Regardless of whether Richard consented to stay, however, we also conclude that the totality of the circumstances created a reasonable suspicion that additional criminal activity was afoot so that prolonging the initial stop was not violative of Richard's Fourth Amendment rights.

Richard argues that Booth's questioning of him during the initial phase of the stop was improper. He claims that questioning him about matters unrelated to the traffic stop "flies in the face of the Fourth Amendment's prohibition against unreasonable searches and seizures." Doc. 21, p. 6. Richard's argument is incorrect. As we note earlier, officers "may also ask about the purpose and itinerary of a driver's trip during the traffic stop." *Brigham*, *supra,* 382 F.3d at 508. Booth did not violate defendant's Fourth Amendment rights by asking those questions.

Booth had received a tip from HSI that a truck matching the description of that owned by Richard was believed to have been involved in transportation of narcotics. Richard was untruthful when giving his itinerary (Booth knew Richard had come from Texas and Richard admitted only to have gone as far as the Texas/Louisiana border to offload is alleged tow) and he was unable to provide coherent and logical answers to the questions of his activities prior to the stop. And Richard was sweating profusely. Booth's suspicions of other criminality were particularized and objective and his extension of the stop was justified.

Richard also argues that law enforcement's "reasonable suspicion to justify the warrantless seizure" was that Richard did not have the paperwork for the vehicle, he was sweating profusely, and the stress indicators, such as sweating, identified by Booth. Doc. 21, p. 9. This is also incorrect. As we note above, those factors relate to the reasonableness of law enforcement to continue to hold him once the business of the traffic infraction was completed. That was not the basis for probable cause to search the vehicle. Probable cause to search was provided by K-9 Sam's positive alert.

Once Richard refused to allow Booth to search the vehicle, Booth retrieved his K-9 officer, Sam, to conduct a sniff. "A dog sniff conducted during a concededly lawful traffic stop that reveals no information other than the location of a substance that no individual has any right to possess does not violate the Fourth Amendment." *Illinois v. Caballes*, 125 S. Ct. 834, 838 (2005). A dog alert provides probable cause to search. *United States v. Williams,* 69 F.3d 27, 28 (5th Cir. 1995), relying on *United States v. Seals,* 987 F.2d 1102, 1107 (5th Cir.), *cert. denied,* 114 S.Ct. 155 (1993). Relying on that probable cause the search was conducted and the drugs were found and seized.

Richard relies primarily on *Rodriguez v. United States*, 135 S.Ct. 1609 (2015), to support his claim that the sniff by the K-9 officer was violative of his rights. Doc. 21, pp. 4-13. While *Rodriguez* says what Richard quotes it as saying in his memorandum, the holding in *Rodriguez* is not helpful to him here.

*Rodriquez* was indicted in the United States District Court for the District of Nebraska for possession with intent to distribute methamphetamine discovered following an alert from a dog sniff conducted after a traffic stop. Following a hearing on the defendant's Motion to Suppress the Magistrate Judge that heard the case concluded that the defendant had been held longer than what was reasonably necessary to conclude business on the issue of the traffic violation, that the dog sniff was not predicated on any reasonable suspicion that other criminal activity was occurring, but nevertheless the evidence would not be suppressed in accordance with a line of cases then prevailing in the Eighth Circuit that held that an extension of the original stop only of short duration "was only a *de minimis* intrusion on Rodriguez's Fourth Amendment rights and was therefore permissible." 135 S.Ct. at 1613. The district court agreed with the recommendation and the Eighth Circuit affirmed. The Supreme Court granted writs in order to "resolve a division among lower

courts on the question whether police routinely may extend an otherwise-completed traffic stop, absent reasonable suspicion, in order to conduct a dog sniff." *Id.* at 1614. The court rejected the Eighth Circuit "*de minimus*" rule and concluded that a sniff conducted when there was no reasonable basis for delay was violative of that defendant's rights. It then remanded the matter to the Eighth Circuit to consider whether the detention of Rodriguez following resolution of the traffic matter was reasonable. Since we conclude the delay during which the sniff was conducted had a reasonable basis, *Rodriguez* does not apply.

In summary with respect to this issue we find there was probable cause to make the initial stop, Richard agreed to remain following the initial stop but, even if he had not, the officers had sufficient information to form a reasonable suspicion that other criminal activity was occurring so that detention of the defendant following conclusion of the investigation for the original stop was not violative of Richard's rights. Initiation of the sniff while defendant was lawfully contained was proper as it involved no constitutional issues. Sam's alert to presence of narcotics in the vehicle provided probable cause for the search of the vehicle. And for these reasons we conclude that the government proved by a preponderance of the evidence that the actions of the officers were constitutional and that there is no basis to exclude the evidence of the narcotics found in the vehicle.

### B. Statements Made Post-Arrest[5]

The Fifth amendment guarantees that "[n]o person ... shall be compelled in any criminal case to be a witness against himself." U.S. CONST. amend. V. In *Miranda* the Supreme Court

---

[5] In his post-hearing memorandum Richard states "[a]s for those statements prior to the license plate warning, the circumstances were that the alleged tip had informed Officer Booth that a tow truck would be coming from Texas into Louisiana on Interstate 10, the questions were not general in nature, but specifically and pointedly directed to transporting illegal narcotics by the defendant. Thus, those statements should be suppressed as well." Doc. 33, p. 4. Defendant does not particularize what statements should be suppressed or provide legal authority for their suppression. We do not address that claim.

extended the Fifth amendment privilege against compulsory self-incrimination to individuals subjected to custodial interrogation by the police. *Miranda v. Arizona*, 86 S.Ct. 16021620-1621 (1966). *Miranda* held that statements made in custodial interrogation are inadmissible unless the suspect is specifically informed of his rights and freely decides to forgo those rights. *Id*. at 1630. "By custodial interrogation, we mean *questioning* initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id.* at 1612 (emphasis added). It also noted that "[v]olunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today." *Id.*

The term "interrogation" under *Miranda* extends to any words or actions on the part of the police "that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 100 S.Ct. 1682, 1689-90 (1980) (footnotes omitted).

> A practice that the police should know is reasonably likely to evoke an incriminating response from the suspect thus amounts to interrogation. But, since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they should have known were reasonably likely to elicit an incriminating response.

*Id.* at 1690 (footnotes omitted).

When a defendant challenges the voluntariness of a statement, the Government bears the burden of proving voluntariness by a preponderance of the evidence. *United States v. Reynolds*, 367 F.3d 294, 297–98 (5th Cir. 2004) (per curiam). A statement is voluntary if, "under the totality of the circumstances, the statement is 'the product of the accused's free and rational choice.'" *Id.* at 298 (quoting *United States v. Garcia Abrego*, 141 F.3d 142, 170 (5th Cir. 1998)). A statement cannot be involuntary in the absence of coercive police activity. *See Garcia Abrego*, 141 F.3d at 170 (quoting *Colorado v. Connelly*, 107 S.Ct. 515, 522 (1986). "Suppression of

inculpatory evidence is an extraordinary remedy. *See Hudson* [*v. Michigan*], 126 S.Ct. 2159. This factor ensures that it is applied only where it serves its purpose of deterring police misconduct. [*Utah v.*] *Strieff*, 136 S.Ct. [2056] at 2063 [(2016)]. In order for a violation to be 'purposeful or flagrant,' it must be more than just negligent. *See id*." *United States v. Mendez*, 885 F.3d 899 (5th Cir. 2018).

Richard argues that the conversations of the officers after his arrest and after he was given his *Miranda* warnings, i.e. the conversations related to his sweating and joking that it appeared he had attempted to run based on that sweating, constituted a "disguised question" that was "'reasonably likely to elicit an incriminating response.'" Doc. 21, p. 11 (defendant uses this quotation in memorandum but provides no cite. This is a statement found in *Rhode Island v. Innis*, 100 S.Ct. 1682, 1690 (1980)). The government does not agree and neither do we.

*Innis* does provide guidance on this issue. There the defendant was arrested on suspicion of murder, given his *Miranda* warnings, and placed in a police vehicle. While being transported to the police station, the officers in the vehicle held a conversation about the murder in question, the fact that they were looking for the weapon used, the fact that the murder occurred near a school for children in need, and how terrible it would be if one of those children found the weapon and hurt themselves before it could be found. *Id.,* 100 S.Ct. at 1686. At that point defendant told the officers to turn the car around and he then led them to the weapon used in the murder. The Supreme Court held that defendant's Fifth amendment rights were not violated because the discussion between the officers did not constitute an "interrogation." The court there stated:

> We conclude that the *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term "interrogation" under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating

> response from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police. . . .A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation. But, since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response.

*Id.* at 1689–90 (footnotes omitted; emphasis provided). The jocular nature of the conversation about defendant's level of perspiration, we find, was not "likely to evoke an incriminating response" and thus was not an interrogation. As a result the officers involved cannot be held accountable for the unforeseeable result of their words, i.e. the inculpatory statements made by the defendant and those statements should not be suppressed.

### III.
#### CONCLUSION

For the reasons given we **RECOMMEND** the Motion to Suppress [doc. 18] be **DENIED**.

Pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties have fourteen (14) days from receipt of this Report and Recommendation to file written objections with the Clerk of Court. Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in this Report and Recommendation within fourteen (14) days of receipt shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the District Court, except upon grounds of plain error. *See Douglass v. United Services Automobile Ass'n*, 79 F.3d 1415, 1429–30 (5th Cir. 1996).

THUS DONE AND SIGNED in Chambers this 7th day of January, 2020.

_____
KATHLEEN KAY
UNITED STATES MAGISTRATE JUDGE